No. 19,698.

Public Utilities Commission of the State of Colorado, et al., *v.* Verl Harvey, Inc., d/b/a Don Ward & Co., et al.

(371 P. [2d] 452)

Decided May 14, 1962.
May 28, 1962, and June 11, 1962, rehearings denied.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN J. CONWAY, Assistant, for plaintiff in error Public Utilities Commission of the State of Colorado.

Mr. E. B. EVANS, for plaintiffs in error Watson, Inc., and Harold E. Watson, Jr.

· Messrs. GRANT, SHAFROTH, TOLL and McHENDRIE, Mr. CHARLES H. HAINES, JR., Mr. T. A. WHITE, Mr. CLAYTON D. KNOWLES, Mr. JOHN C. STREET, Mr WILLARD M. PECK, for defendants in error.

*In Department.*

Opinion by Mr. Justice Hall.

Herein we refer to the plaintiffs in error as follows: Public Utilities Commission of the State of Colorado, as the "Commission"; Watson, Inc., and Harold E. Watson, Jr., as "Watson." We refer to defendants in error as "Respondents," or by name.

From the record before us it appears that: On September 29, 1930, the commission issued to Harry Matteson Trucking Service PUC Certificate No. 498. This certificate granted authority to conduct:

" * * * a transfer, moving and general cartage business in the City of Loveland and in the County of Larimer and for occasional service throughout the State * * * subject to the following conditions * * * :

* * *

"(b) The applicant shall not operate on schedule between any points;

"(c) The applicant shall not be permitted, without further authority from the Commission, to establish a branch office or to have any agent employed in any other town or city than Loveland, for the purpose of developing business; * * *."

On August 2, 1947, Watson acquired and at all times since said date has owned and now owns said Certificate No. 498 and all operating rights granted thereby.

On July 10, 1952, the commission issued to Verl Harvey PUC Certificate No. 2177, granting to him authority to transport:

" * * * cement in bulk, from and to, to and from, and between, all points in the State of Colorado."

Since March 14, 1959, Verl Harvey, Inc., has been the owner of said certificate and has been rendering service to the public, pursuant to and in conformity with authority granted by said certificate. The other respondents at all times mentioned herein have been and now are

certificated and regulated common carriers of freight, including cement.

On January 14, 1955, Watson filed with the commission his application for a certificate of public convenience and necessity to transport cement in truckload lots to all points in Colorado. Such authority to be a new and separate authority and not an extension of authority granted by PUC Certificate No. 498.

On January 18, 1955, Verl Harvey filed with the commission a complaint, wherein he charged Watson with (1) engaging in the business of hauling cement without authority and in direct and aggressive competition with Harvey's operations conducted pursuant to authority granted to him by the commission, as evidenced by PUC Certificate No. 2177; (2) maintaining a branch office in Denver in direct violation of that portion of his PUC Certificate No. 498, which forbids Watson from maintaining an office outside of Loveland.

Hearing on the above-mentioned complaint was had on May 4 and 5, 1955. On June 28, 1955, the commission made findings holding that Watson's cement operations were without authority and in violation of law, and also found that he was maintaining an office in Denver contrary to the terms of his PUC Certificate No. 498. Having so found, the commission ordered Watson to cease and desist from such unlawful acts.

The commission in its statement, findings and order, among other things said:

"* * * We think the evidence is clear that Watson pursued his intention to establish a major cement hauling operation irrespective of what his authority might be.

* * *

"This case is one which strikes at the very root of motor vehicle regulation. We have here a person who buys a small local cartage company, * * *.

"* * * the buyer [Watson] uses this local cartage operation as a stalking horse; with it as an excuse, the buyer establishes a major truck line, having no associa-

tion with the small cartage operation. * * *. The nature of the major business is totally unrelated to the local cartage business. Of the total revenue of the two businesses, only 10% comes from the local cartage business. * * *.

"When brought up short, the buyer says he believes that the authority of the local cartage business is such that he can haul from anywhere in the State to anywhere else in the State, for anybody in any volume at any time * * *.

"We cannot agree. We believe that these arguments violate every principle of regulatory law, as well as offend the sense of the certificate Watson holds. * * *.

\*    \*    \*

"In short, the testimony of Watson and the whole case indicates a reckless intent on the part of Watson to do what he pleases when he pleases without regard to regulation, except to follow form only, and only when that is not inconvenient.

\*    \*    \*

" * * * we do recognize our primary duty to confine any motor carrier's operations to the scope provided in that carrier's certificate of authority, as a fundamental necessity to maintaining any system of regulation. * * *.

\*    \*    \*

"We are satisfied that Watson has indeed known that his operations here complained of were outside his authority. In such cases we ordinarily levy some punishment, such as requiring that all operations be stopped entirely for several months, to discourage future violations.

"As to the following Order that the regular cement hauls be stopped, no punishment is involved. This operation is clearly outside his authority. We cannot lawfully suspend that operation, for the term 'suspend' indicates a resumption at some future time. In this case, it would be just as unlawful in the future as it is now. We must therefore not suspend it, but stop it entirely."

The commission, on July 18, 1955, heard Watson's application for a new certificate and found:

"The numerous protestants show, by uncontradicted evidence, that they have idle equipment ready to serve the entire state from the points applicant now seeks to serve. The public, thus, can get the additional service applicant wants to offer, by calling existing carriers, who will use existing equipment.

"In this state of the evidence, we see no alternative but to find, and we do find, that existing service requirements are being adequately met; that the present or future public convenience and necessity do not, and will not, require applicant's proposed new service, and that the application should be denied."

No appeal was taken from this decision.

Watson took the necessary steps to have the cease and desist order entered June 28, 1955, reviewed by the district court, which court entered its judgment reversing the order of the commission, and which judgment of the district court was reversed by this Court on October 14, 1958, and the order of the commission affirmed. *P.U.C. v. Watson*, 138 Colo. 108, 330 P. (2d) 138.

Following entry of the order to cease and desist, and during the three years, three and one-half months consumed in having the matter reviewed and brought to a final conclusion by this Court, and since the decision of this Court and up to the present time, Watson has without interruption continued with and expanded his outlaw operations.

Instead of desisting, he has persisted in his unauthorized operations with renewed vigor, more equipment, and extended his operations to points in Colorado not previously served. He has conducted a thriving statewide business to the damage of licensed and lawful operators and in defiance of the commission, the law and the judgment of this Court.

After some seven years of unlawful operations, Watson did, on March 20, 1959, file with the commission his

application for a certificate of public convenience and necessity to transport:

(a) Cement in bulk and sacks on a statewide basis;

(b) Pyrites in bulk from Denver, Colorado, and a radius of five miles thereof, to Boettcher and to Portland, Colorado;

(c) Limestone between all points in Colorado;

(d) Crushed Marble from Glenwood Springs to all points in Colorado.

The application was set for hearing and interested parties notified. At the hearing the Ideal Cement Company (not a party here) appeared urging approval of the application for transportation of pyrites in bulk from Denver, Colorado, and a radius of five miles thereof, to Boettcher and to Portland, Colorado.

Respondents appeared and opposed the granting of any portion of the requested authority. In addition to the respondents, eight other certificated carriers (not here) appeared and opposed the granting of any portion of the requested authority.

After hearing, the commission, on July 6, 1959, entered its order granting to Watson, Inc., authority for the transportation of:

"1. Cement in bulk and in sacks from cement plants located at Boettcher, Colorado, and Portland, Colorado, to Denver, Colorado, and points within a radius of 50 miles of Denver.

"2. Pyrites in bulk from Denver and a radius of 5 miles thereof, to Boettcher and Portland, Colorado.

"3. * * * PROVIDED, HOWEVER, that the granting of this authority is contingent upon the surrender for cancellation of Certificate of Public Convenience and Necessity No. 498 now held by Harold E. Watson, Jr., doing business as 'Watson Transport, Inc.' * * *."

On July 24, 1959, protestants filed petitions for rehearing. Rehearing was granted and further testimony taken on August 10, 1959.

On January 20, 1960, an order of the commission was

entered granting the authority above set forth. Petitions for rehearing were filed and on February 24, 1960, denied, whereupon the order became final.

On March 24, 1960, the respondents filed their complaint in the district court seeking review of the foregoing final order.

On October 25, 1960, the judge of the district court entered findings and judgment, stating:

"In my judgment in this case the commission has gone beyond its authority. It has abused its discretion, vested in it by law. Counsel has read to the court many of the excerpts from the transcript and from those I find that the evidence that the public needs Watson's services is not convincing. The evidence that public convenience and necessity require Watson to serve the public is not convincing. The evidence of the inadequacy of the present service without Watson is rather vague and unsatisfactory. Watson stands before the court, from this record, from undisputed testimony, as not the kind of a citizen that should induce a public body such as the Public Utilities Commission to lean over backwards in a close case to grant him a boon. His illegal operations, from the evidence in the record, are of long standing, long continuing, intentional and flagrant, and do not come within the purview of the decisions cited to the court by the Public Utilities Commission counsel to the effect that illegal operations do not bar subsequent certificates.

"In my judgment, and I so find, the Commission in entering the order granting this defendant Watson a certificate of public convenience and necessity, being decision number 53719, acted capriciously and arbitrarily and entered findings not supported by the evidence adduced before it. And thus the Commission exceeded its authority under the law and its actions constitute an abuse of discretion.

"The order of the Commission in this case is not just or reasonable and its conclusions are not in accordance

with the evidence. The order of the Commission is vacated and set aside."

The commission, Watson, Inc., and Watson are here by writ of error seeking reversal.

We find it impossible to reconcile the decision of the commission in this case with the facts presented or with its decision of July 18, 1955, wherein Watson, with only three years' illegal operations as a background, with lack of proof of need for additional service, was denied a certificate, and in this case with eight years of continuous, unlawful, defiant, contemptuous, expanded operations to his credit, and with a total lack of proof of need for additional service, is granted authority.

In 1955 the commission held that Watson's operations were without authority and beyond the authority granted by PUC Certificate No. 498, and in so deciding stated that:

"The numerous protestants show, by uncontradicted evidence, that they have idle equipment ready to serve the entire state from the points applicant now seeks to serve. The public, thus, can get the additional service applicant wants to offer, by calling existing carriers, who will use existing equipment.

"In this state of the evidence, we see no alternative but to find, and we do find, that existing service requirements are being adequately met; that the present or future public convenience and necessity do not, and will not, require applicant's proposed new service, and that the application should be denied."

From the record before us it appears that that language can be used with reference to Watson's present application with the same propriety as applied to his first application.

■ In its decision *herein,* the commission stated that:
"* * * Harold Watson has been engaged in hauling cement during the period of litigation [since June 28, 1955], and after final determination by the Court, filed this application for authority *to take care of the trans-*

*portation business he has developed under his Certificate No. 498* by organizing a corporation and filing said application in the name of that corporation." (Emphasis supplied.)

That statement ignores in toto the previous finding of the commission, affirmed by this Court, that PUC Certificate No. 498 did not authorize Watson to haul cement except occasionally, if at all, and the above statement that he now seeks authority "to take care of the transportation business he has developed under his Certificate No. 498" is in direct conflict with the previous ruling of the commission and contrary to the decision of this Court. The cement hauling business that he has built up is wholly unlawful. If that business were authorized by Certificate No. 498 and developed thereunder, then he needs no additional authority.

The commission in its order granting Watson authority further stated:

"* * * The record is filled with questions and answers pertaining to Harold E. Watson's operations under his Certificate of Public Convenience and Necessity No. 498; protestants complaining of illegal operations. That this is true was determined after a final interpretation of his authority by the Commission, which was ratified by the Colorado Supreme Court. *It appears, however, that there are extenuating circumstances. * * *.*" (Emphasis supplied.)

The commission does not point out any extenuating circumstances. We find none in the record, but do find an abundance of convincing, uncontradicted evidence, including Watson's admissions, orders of the commission and the judgment of this Court, that all of Watson's actions have at all times been without authority; since 1955 they have been in defiance of the valid order of the commission, and since October 18, 1958, have been in direct and knowing violation of the judgment of this Court. The persistent, protracted, intentional and knowingly doing of prohibited acts for five years is incom-

patible with a holding that said acts were done under extenuating circumstances.

In granting authority, the commission further stated:

"* * * The fact that applicant has technically violated a State law or even the Act which we adminster, is not always, as we have held in numerous cases, an absolute bar to the granting of a certificate. We think that applicant is willing to conform to the provisions of the Act and our requirements, rules and regulations thereunder. * * *."

■ We find nothing in the record to warrant any statement or inference that Watson's violations were technical. The record is clear and uncontradicted that Watson for seven years hauled on an average of over one hundred and fifty loads of cement per month, each load weighing over twenty tons, every load hauled constituting an illegal operation. During that period of time over ninety percent of his income came from these unlawful acts. To refer to such conduct as a technical violation is somewhat at variance with our understanding of "technical violations."

We recognize that it is the function of the commission to resolve questions of fact and that if its findings are supported by competent evidence the same will not be disturbed by the courts.

■ Here the commission did find that public convenience and necessity justify the granting of authority to Watson and that the proposed service of Watson is in the public interest. We find no evidence in the record to warrant any such finding. Authorized carriers, according to the record, are well able to meet the requirements of the public; they have equipment and manpower available, both idle at times for lack of business. No shipper has ever complained to the commission of the refusal or inability of licensed carriers to meet their every demand. The substance of the testimony of some six shipper witnesses is that they at times use and like Watson's service and find it convenient to have the serv-

ices of numerous and various carriers available. Understandably none had ever complained to the commission of lack of service for licensed carriers were ready, able and willing to serve all, and Watson's unlawful operations only served to make available an additional and unnecessary service.

The commission, in *In Re Raymond H. Bodley,* Application No. 1715, Decision No. 3143, said:

"It has been held not infrequently by this Commission that if the public convenience and necessity required the extension of a certificate, the holder of the certificate should first seek and obtain the extension and not take the law into his own hands, as so many who do not have certificates are inclined to do.

\* \* \*

"To grant a certificate to one who has flagrantly violated the law is to put a premium on the violation of the law which we are under oath to administer and enforce. Before the commission would feel warranted in granting Bodley any further certificate rights, it should want the granting of such rights to be preceded by strict observance of the law for a substantial period of time."

Clearly the commission, in granting the authority to Watson, acted in a manner entirely out of harmony with its foregoing pronouncement.

In *Donahue v. Public Utilities Commission,* 145 Colo. 499, 359 P. (2d) 1024 (decided February 27, 1961, after the commission's ruling herein), we said:

"\* \* \* The finding by the commission that, '\* \* \* nor can we say that his [protestant's] service is adequate at this time,' falls far short of a finding of failure reasonably to supply the need. There is not sufficient competent evidence in this record to warrant any such finding. The finding which is called the 'serious question' confronting the commission, namely, 'Is there sufficient business to warrant two certificated carriers?' amounts to a repudiation of the basic concept upon which the

structure of Public Utility Commission powers is based, namely, that of regulated monopoly.

\* \* \*

"In our opinion there is no competent evidence in the record before us to show need for the additional service by applicant. *Nor can there be until protestant has had a reasonable time to demonstrate what may be done by him free and unfettered by the unauthorized competition to which he has been subjected at all times pertinent to this action."* (Emphasis supplied.)

Also in *Donahue,* supra, we quoted with approval the following language:

"In Tidewater Express Lines, Inc. v. Chesapeake Motor Lines, Inc., 11 P.U.R. 3d 182, 184-185, we find the following:

'To grant this application would, in effect, be permitting Chesapeake to use the evidence of its wrongdoing in its own behalf. Obviously this cannot be done. If this were not so every freight hauler in the state could, and perhaps would, begin infringement upon the rights of others in an effort to build up a case to support an application for the broadening of his authority. The rights and protection of a permit would be a nullity. "Public convenience and necessity" involves more than simply showing that another's business can be taken away from him by one means or another. And it is more than rendering "better" service.'

"The commission has on at least one other occasion given utterance to the above doctrine. In Re Colorado Hiway Transport, Inc., 7 P.U.R. 3d 318, it said:

'We recognize that applicant has developed considerable business to Camp Carson, but we also realize that he cannot prove the need for a private carrier permit by unauthorized operation only.' "

██ Presented to the commission in opposition to granting of any authority to Watson was the contention of protestants, supported by uncontradicted evidence, that licensed carriers were ready, able and willing to fill

the requirements of shippers, including the needs of those who have been using the service of Watson. Instead of making a finding that additional facilities were or were not needed, the commission expressly avoided answering this very important question, and stated:

"That the services which Applicant seeks to provide are necessary for the public convenience and necessity even though there are other carriers who allege (though the Commission does not so find from the record) that they can adequately fill the vacuum which would result from cessation of operations by the Applicant."

There is no evidence in this record which would sustain a finding that adequate service was not available from licensed carriers. Certainly added authority should not be granted when there is no proof of need therefor.

In denying Watson's application in 1955 the commission described Watson's then unlawful operation as "one which strikes at the very root of motor vehicle regulation." That language is particularly applicable to his present operations which have no sanction in law, cannot be condoned and must be terminated; otherwise regulation will be wholly ineffective and meaningless.

The judgment is affirmed and the cause remanded with directions to the trial court to order the Commission to deny Watson's application and dismiss the proceedings.

MR. JUSTICE McWILLIAMS and MR. JUSTICE PRINGLE concur.