Mr. Justice Day
delivered the opinion of the Court.
The plaintiff in error will be referred to as Red Ball; the defendant in error The Public Utilities Commission *331 of the State of Colorado as the Commission; Rio Grande Motor Way, Inc., as Motor Way. Rio Grande Western Railroad Company will be referred to as Rio Grande or the Railroad.
This proceeding had its inception before the Commission in an application filed on May 18, 1962, in which Motor Way, a Colorado corporation, and a wholly-owned subsidiary of the Rio Grande, sought a certificate of public convenience and necessity authorizing it to operate as a motor vehicle common carrier in the transportation of “rail freight and express between Denver and Pueblo and intermediate points, over U. S. Highway Nos. 85 and 87, including service at certain named off-route points.” Under its existing certificate of public convenience and necessity, P.U.C. No. 149, Motor Way was, and is now, authorized to transport general commodities, over certain regular and irregular routes within Colorado, in an area bounded generally by Grand Junction, Glenwood Springs, and Denver on the north, Colorado Springs, Pueblo and Walsenburg on the east, Alamosa and Durango on the south, and Montrose and Delta on the west, without authority to operate between Denver and Pueblo. The Motor Way also held, and still holds, private carrier permit No. A-716, authorizing it to transport “freight between Denver and Grand Junction, and intermediate points, over U. S. Flighway 85 to Pueblo and U. S. Highway 50 from Pueblo to Grand Junction.”
During the period beginning in the middle 1940’s until sometime in 1951, the Motor Way held an interim “War Emergency” certificate of public convenience and necessity issued by the Commission authorizing it to perform essentially the same transportation service sought in this proceeding. After the termination of the period of “wartime emergencies” the Commission, in Decision No. 34504, dated March 31, 1950, entered an order providing that the interim certificate of Motor Way and various other carriers be terminated not later than October 1, *332 1950. Motor Way did not receive notice of this action so continued to operate without a certificate until approximately May 10, 1962, on which date the Commission informed Motor Way, in writing, to “cease and desist” its practices. Thereafter, on approximately May 25, 1962, the Commission apparently informally and without notice to Red Ball, issued to Motor Way a “temporary authority” purporting to authorize a continuation of the operations pending disposition of the instant proceeding.
Red Ball has been engaged in operations as a motor vehicle common carrier pursuant to Certificate of Public Convenience and Necessity, P.U.C. No. 8, issued many years ago by the Commission. As applicable to the instant proceeding, Red Ball is authorized under its certificate to transport “freight and express” between Denver and Pueblo, Colorado, serving all intermediate points on U. S. Highways 85 and 87, as well as the various off-route points involved in this proceeding.
By its Decision and Order dated November 30, 1962, the Commission granted a certificate of public convenience and necessity to Motor Way which it is contended authorizes it to operate motor vehicle common carrier service identical to that of Red Ball. Upon review, the district court of the City and County of Denver entered judgment affirming the decision of the Commission. This writ of error is directed to that judgment.
The various arguments advanced by Red Ball in support of its attack on the validity of the Commission’s decision and order may be summarized under two general headings:
1. That the Comission’s decision and order is not “a substitution of motor for rail facilities” but is, in fact, a general certificate of convenience and necessity authorizing virtually unlimited motor vehicle common carrier service and that the purported conditions or limitations in the certificate will not operate to prevent *333 a destructive, competitive service identical to that being supplied by Red Ball.
2. That the order is illegal and invalid for lack of the following jurisdictional prerequisites (a) that there is a public need for the proposed public motor common carrier operation and (b) that the available service of the existing common carriers is inadequate.
Taking up first the nature of the Certificate of Authority issued to Motor Way, we agree with the contention of Red Ball that it is not so restrictive within the four corners thereof as to prevent Motor Way from expanding its operation into a competitive motor carrier service almost identical to Red Ball. The authority grants generally the right to transport, on schedule, shipments of rail freight and express weighing 5,000 pounds or less in intrastate commerce between Denver and Pueblo, Colorado, via U. S. Highway Nos. 85 and 87 with the right to serve from, to and between all intermediate points on said routes served by the Denver and Rio Grande Western Railroad Company on its line, substantially paralleling said highway routes. It also grants the right to serve off-highway-on-rail points of Fort Logan, Blakeland, Louviers, the Air Force Academy, Fort Carson and Minnequa. Then follows a listing of five conditions, as follows:
“1. The service by motor vehicle to be performed by applicant shall be limited to service which is auxiliary to, or supplemental of, railroad service.
“2. Shipments transported by applicant shall be limited to those which it receives from or delivers to the Denver and Rio Grande Western Railroad Company or the Railway Express Agency, Inc.
“3. Applicant, the said railroad and express companies, shall not hold out or represent to the public that Rio Grande Motor Way, Inc. is conducting motor vehicle transportation service for the movement of freight and express under the authority herein granted, and shall not publish local freight rates applying between said *334 points for independent motor truck transportation, or establish joint rates with any motor vehicle carrier.
“4. All contractual arrangements between applicant and the railroad and express companies shall be reported to the Commission and shall be subject to revision if and as the Commission finds it necessary in order that such arrangements shall be fair and equitable to the parties.
“5. Such further specific conditions as the Commission in the future may find it necessary to impose, in order to restrict applicant’s operations by motor vehicle service that is auxiliary to, or supplemental of, railroad or express service, the Commission hereby retaining jurisdiction to enter such orders, if deemed necessary in the public interest, * * * ”
We find from the record the Motor Way did not seek an expanded authority and we further find that the certificate that it received is subject to be interpreted as authorizing motor carrier service far in excess of what it asked for. It appears now that Motor Way would like to keep what has been given to it, though its position was quite clear from the outset that its request was substantially more modest. Essentially what was sought by Motor Way was to continue to do under P.U.C. sanction what it has been doing for thirteen years. The operation may be described thusly:
The Rio Grande Railroad operating as a common carrier had authority, and still has, to carry freight, large quantities and small, over its railroad tracks in boxcars, coal cars, flat cars and railroad baggage cars. During the war emergency, when its rolling stock was commandeered for the war effort, Rio Grande continued to offer freight service between Salida, Pueblo and Denver and intermediate points, but on receipt of freight in less-than-carload shipments transported it over the highway, substituting trucks for railroad cars. It was not offering a motor carrier service as that term is known, and at the very time it was using this “motor for rail,” *335 Red Ball was granted a Certificate of Convenience and Necessity to operate a motor carrier service. We can assume from what appears in the record that essential differences between the services were recognized; that Red Ball apparently got its certificate on the basis of not- being constructively competitive with what Rio Grande and Motor Way were doing. At the time of the issuance of the “War Emergency” certificate the type of service under discussion here was described by the Commission in a June 11, 1942, order as follows:
“It is proposed to pick up rail freight at rail stations and to deliver the freight at destination to the railroad at its stations. Where Motor Way in the past has not performed pick-up and delivery service for the railroad, all pick-up and delivery service will be performed by the rail carrier.”
What has been loosely described in the record and in the briefs as “substituted service” has in fact been really nothing more than substituted transportation, or to put it another way, substituted facilities. Therefore, when the authority was first granted it was not deemed necessary to require testimony as to the public convenience and necessity.
When the Commission, in 1950, terminated the temporary “War Emergency Authority,” Rio Grande did not return to its former practice of transporting freight of less-than-carload lots in railroad boxcars and baggage cars, but continued to accept such freight when requested to do so by the shipping public and to transport it over the highway. This it did under the mistaken belief that its temporary authority was still in existence. The type of freight being accepted and transported by Motor Way in a period of two months prior to the hearing involved 18,231 pounds for a total freight revenue of $191.69 — hardly competitive or destructive.
It is contended, therefore, that before the Commission can authorize the substituted “truck for rail” transportation it must hold a hearing and take testimony from *336 the shipping public as to the need of the service and the inadequacy of existent motor carrier service. We cannot agree with that contention in a situation such as presented here.
 We do hold, however, that if the authority sought or the authority granted is an expanded service, or a motor carrier service, then there must be proof of and a finding of public need and inadequacy of existing common carrier service before any such expanded motor carrier service can be granted. There are a sufficient number of Colorado cases defining the Commission authority, in that regard, as to leave no doubt of the jurisdictional prerequisites. Denver & Rio Grande Western Railroad Company, et al., v. Public Utilities Commission, 142 Colo. 400, 351 P. (2d) 278; Donahue v. Public Utilities Commission, 145 Colo. 499, 359 P. (2d) 1024; Public Utilities Commission, et al., v. Verl Harvey, Inc., et al., (1962) 150 Colo. 158, 371 P. (2d) 452; McKenna, et al., v. Nigro, et al., (1962) 150 Colo. 335, 372 P. (2d) 744; Ephraim Freightways, Inc., v. Public Utilities Commission, et al., (1963) 151 Colo. 596, 380 P. (2d) 228; Colorado Transport Co. v. Public Utilities Commission, 141 Colo. 203, 347 P. (2d) 505. If, on the other hand, what was sought by Motor Way and what was intended to be granted by the Commission was a limited and restricted authority to do what has been described by the witnesses as the typical service actually rendered for twenty years, then we hold that the needs of the public or the adequacy of existing motor carrier service is not in issue and no hearing on those points need be held. The shipper, once having deposited freight on the loading dock of a railroad station, directed to be shipped to the designated consignee who is to pick it up at the ■freight station of that same railroad at the terminal point, is not concerned as to how it is transported from one point to the other, nor can Red Ball be interested or affected by that type of freight handling which has always differentiated railroad from motor carrier serv *337 ice. We reiterate and re-emphasize that it was such a differentiation that enabled Red Ball, and indeed the entire motor carrier service as now constituted to enter the picture despite the existing railroad freight service.
We, therefore, have only one point to consider. Is the certificate as issued restricted to the type of service which was the subject matter of the hearing before the Commission? We do not believe that it is.
This is the first case to come before this court on the question of substituted “truck for rail” transportation. However, such service is not unknown in Colorado, and is so prevalent as to be commonplace throughout the country. It has been a natural evolution as railroads were forced to abandon outmoded rolling stock and to substitute trucks which travel either over the highway or “piggy back” on flat cars. The Commission in its findings referred to two cases in which it had done this very thing, neither of which was ever reviewed by the courts, but it is to be noted that in those cases the Commission imposed restrictions which are omitted in this case and which we hold to be vital to the issues involved. For example, the Commission in its findings called attention to its orders in an application of the Santa Fe Railroad for “motor for rail” facilities between Denver and Holly and the Colorado-New Mexico state line, and other points. Authority was granted but the restrictions therein imposed were as follows:
“1. The service by motor vehicle to be performed by applicant shall be limited to service which is auxiliary to, or supplemental of, railroad service.
“2. Applicant shall not serve, or interchange traffic at any point not a station on a rail line of The Atchison, Topeka and Santa Fe Railway Company or a rail subsidiary thereof, a ‘station’ being any station or depot facility adjacent to or reasonably near railroad tracks where less-than-carload freight normally is unloaded from or loaded on or into freight cars or where such *338 freight ordinarily is received from consignees or made available to consignees within depot grounds.
“3. Shipments transported by applicant shall be limited to those which it receives from, or delivers to, the railway under a through bill of lading.” (Emphasis supplied.)
No such restrictions, as the Commission imposed in that similar situation, were made a condition.in the certificate of authority granted in the case at bar. Omitted was the very vital and descriptive restrictions emphasized above. The Commission alluded to Interstate Commerce Commission practices when dealing with similar applications but failed to adopt restrictions imposed by the I.C.C. in those cases. These conditions, which the United States Supreme Court has described as constituting firm standards to insure that the expanded service will be no more than auxiliary or supplemental, are contained in the case of American Trucking Associations, et al., v. United States, et al., 364 U. S. 1. The court in that case said:
“Thus it is evident that the policy of opposition to railroad incursions into the field of motor carrier service has become firmly entrenched as a part of our transportation law. Moreover, this general policy fortunately has not been implemented merely by way of a more or less unguided suspicion of railroad subsidiaries, but rather has evolved through a series of Commission decisions from embryonic form into a set of reasonably firm, concrete standards. The Commission’s opinion in the case at bar describes these standards as follows:
“ ‘The restrictions usually imposed in common-carrier certificates issued to rail carriers or their affiliates in order to insure that the service rendered thereunder shall be no more than that which is auxiliary to or supplemental of train service are: (1) The service by motor vehicle to be performed by rail carrier or by a rail-controlled motor subsidiary should be limited to service which is auxiliary to or supplemental of rail service, *339 (2) Applicant shall not serve any point not a station on the railroad, (3) A key-point requirement or a requirement that shipments transported by motor shall be limited to those which it receives from or delivers to the railroad under a through bill of lading at rail rates covering, in addition to the movement by applicant, a prior or subsequent movement by rail, (4) All contracts between the rail carrier shall be reported to the Commission and shall be subject to revision if and as the Commission finds it to be necessary in order that such arrangements shall be fair and equitable to the parties, and (5) Such further specific conditions as the Commission, in the future, may find it necessary to impose in order to insure that the service shall be auxiliary to, or supplemental of, train service * * *’ ” (Emphasis supplied.)
The restrictions numbered (2) and (3) in the quotation above are the very heart of the order and serve most effectively to prevent the type of motor carrier service which would become ruinously competitive to existing motor carriers.
In final analysis, the error of the Commission action was not in taking jurisdiction of the application, but in failing to set out firm standards whereby from the certificate itself the authority granted is and the limitations imposed are clearly defined. Merely to state that the Motor Way operations are to be auxiliary to or supplemental of railroad service is not enough. The absence of explicit restrictions which the Commission recognized in other cases and failed to impose here points up the error. What is denominated as and intended to be a restricted authority should not at the same time be so broad as to require repeated litigation and piecemeal interpretation to discover what can or cannot be done under the authority.
The judgment is reversed with instructions to the trial court to remand the cause to the Commission for entry of an order vacating the certificate as now issued; *340 any new certificate issued to be in harmony with the views herein expressed.
Mr. Justice Moore not participating.