**CITY OF BOULDER and Colorado Independent Energy Association, Petitioners–Appellants,**

v.

**The COLORADO PUBLIC UTILITIES COMMISSION; Commissioner Robert J. Hix; Commissioner Vincent Majkowski; Commissioner R. Brent Alderfer; Public Service Company of Colorado; and the Office of Consumer Counsel, Respondents–Appellees.**

No. 98SA216.

Supreme Court of Colorado,
En Banc.

March 27, 2000.

turbines at the Pawnee power plant near Brush, Colorado (upgrade project). We affirm.

## I.

On February 1, 1996, PSCO entered into a contract with General Electric Corporation (GE) for the manufacture of replacement turbine blades and related equipment for the Pawnee power plant. Under the contract, GE guaranteed that the new turbine equipment would produce a 2.12% improvement in the Pawnee plant's heat rate and an increase in capacity of 14 megawatts. The contract allowed PSCO to withhold 10% of the purchase price pending fulfillment of the performance guarantees.

Kelly/Haglund/Garnsey & Kahn LLC, Jeffrey G. Pearson for Jeffrey G. Pearson, LLC, of Counsel David R. Fine, Denver, Colorado, Attorneys for Colorado Independent Energy Association.

Dietze & Davis, P.C., Karl F. Kumli, III, Boulder, Colorado, Attorneys for City of Boulder.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Linda L. Siderius, Deputy Attorney General, Raymond L. Gifford, First Assistant Attorney General, Mana L. Jennings–Fader, Assistant Attorney General, Regulatory Law Section, Denver, Colorado, Attorneys for Colorado Public Utilities Commission; Commissioner Robert J. Hix; Commissioner Vincent Majkowski; and Commissioner R. Brent Alderfer.

LeBoeuf, Lamb, Green & Macrae, L.L.P., Mark A. Davidson, Denver, Colorado, Attorney for Public Service Company of Colorado.

No appearance by or on behalf of Respondent–Appellee Office of Consumer Counsel

Justice HOBBS delivered the Opinion of the Court.

This case is before us on direct appeal from the district court pursuant to section 40–6–115, 11 C.R.S. (1999). The district court affirmed a decision by the Colorado Public Utilities Commission (PUC) awarding a certificate of public convenience and necessity (CPCN) to the Public Service Company of Colorado (PSCO) for an upgrade of the

PSCO notified the PUC on February 20, 1996 that it intended to initiate the turbine upgrade project during the planned overhaul of the Pawnee plant scheduled for 1997. PSCO informed the PUC that the project would improve the operating efficiency of the plant, improve the plant's heat rate, improve sustained performance, increase time between turbine overhauls, and lower operation and maintenance costs at the plant. PSCO also represented that the project would add 16 megawatts to the plant's generating capacity, and provide approximately $850,000 annually in benefits to ratepayers. The total estimated cost of the turbine upgrade project, including installation, was $11,761,000. PSCO had paid $2,050,000 of this sum to GE as of June 1996.

On July 29, 1996, pursuant to a PUC order, PSCO filed an application with the PUC requesting either a CPCN for the upgrade project, or, in the alternative, a finding that the upgrade did not require a CPCN. PSCO took the position that a CPCN was not required. The Colorado Office of Consumer Counsel (OCC), the Colorado Office of Energy Conservation (OEC), the staff of the PUC, the Colorado Independent Energy Association (CIEA), and the City of Boulder (Boulder) all intervened.[1] The OCC stipulated that it did not oppose the project, but that it reserved the right to challenge the prudence of the investment in a later pro-

---

1. Because they present identical arguments in this appeal, we refer to CIEA and Boulder collectively as "Boulder" in the remainder of this opinion.

ceeding. The PUC staff likewise did not oppose the project, but argued that risks related to the project should rest with PSCO, not ratepayers.

Boulder argued that a CPCN was required and that the PUC's revised 1996 Integrated Resource Planning Rules (IRP rules), 4 C.C.R. § 723–21, required competitive bidding for the turbine upgrade project. Boulder later added the argument that allowing the upgrade project to go forward would violate the federal Public Utility Regulatory Policy Act, 16 U.S.C. § 824a–3 (1994) ("PURPA").

A PUC administrative law judge (ALJ) held a hearing on November 21, 1996, and issued a recommended decision dated January 31, 1997. The ALJ concluded that the upgrade project did not require issuance of a CPCN, because the turbine would have to be replaced no later than the 2004 scheduled overhaul at Pawnee and upgrading the turbine sooner would provide a more immediate benefit to ratepayers. The ALJ found that the 16 megawatt increase in capacity was not the objective of the upgrade project, but a result of the increased efficiency the upgrade would occasion. The ALJ rejected Boulder's contention that the revised IRP rules applied, finding that PSCO initiated the upgrade project prior to the date those rules went into effect. Finally, the ALJ adopted the PUC staff's recommendation that PSCO should bear the risk of the upgrade project.

PSCO had already completed the project by the time the PUC rendered its final decision on July 9, 1997. The PUC adopted the ALJ's decision in part, but determined that a CPCN was in fact necessary for the upgrade project because of its high costs and the newness of the technology. It then decided to issue the CPCN, because the upgrade project would yield improvements in heat rate and generation efficiencies benefiting ratepayers, and thus served the public interest. The PUC concluded, in fact, that PSCO should be encouraged to implement such improvements system-wide.

Boulder filed a petition for reconsideration with the PUC, contending that: (1) section 40–5–101(1), 11 C.R.S. (1999), forbade the PUC from awarding a CPCN to PSCO retro-

actively; and (2) the PUC's approval of the upgrade project violated PURPA. The PUC denied the petition. In regard to section 40–5–101(1), the PUC held that while this statute constrained the actions of utilities, it did not restrain the PUC in determining whether to issue a CPCN. As for PURPA, the PUC found that its prior rulings and Boulder's own contracts with PSCO rendered payments to PURPA qualifying facilities (QF's) susceptible to change.

Boulder petitioned the District Court for the City and County of Denver for review. The court affirmed the PUC's decision. Boulder then brought its appeal to us.

## II.

We uphold the PUC's decision to grant a certificate of public convenience and necessity for the Pawnee power plant turbine upgrade project.

### A. Standard of Review

■ We begin our analysis by summarizing the applicable standard of review. The General Assembly has empowered the PUC to "generally supervise and regulate every public utility in this state; and to do all things, whether specifically designated [in the utilities code] or in addition thereto, which are necessary and convenient in the exercise of such power." § 40–3–102, 11 C.R.S. (1999). Our review focuses on three concerns: (1) whether the PUC has regularly pursued its authority; (2) whether its decision is supported by substantial evidence in the record viewed as a whole; and (3) whether the decision is just and reasonable. *See CF & I Steel v. Public Utils. Comm'n*, 949 P.2d 577, 585 (Colo.1997).

■ While the PUC's interpretations of law do not control our review, when statutes and regulations for which the agency possesses enforcement authority are ambiguous, we give deference to the agency's interpretations. *See PSCO v. Trigen–Nations Energy Co.*, 982 P.2d 316, 322 (Colo.1999); *see also CF & I Steel*, 949 P.2d at 585. We set aside interpretations of ambiguous law within the PUC's administrative purview only when

clearly erroneous, arbitrary, or in excess of the PUC's authority. *See CF & I Steel,* 949 P.2d at 585. PUC factual findings are "presumptively valid and must be viewed in the light most favorable to its decisions." *Boulder Airporter Inc. v. Rocky Mountain Shuttlines, Inc.,* 918 P.2d 1118, 1120 (Colo.1996).

With these principles in mind, we identify Boulder's contentions and summarize our holding on each of these points before turning to our analysis. Boulder advances three arguments as to why we should reverse the PUC's decision to award the CPCN for PSCO's upgrade project. First, Boulder argues that the PUC was not entitled to issue a CPCN to PSCO for a project that the utility had already undertaken. We hold that the PUC has sufficient statutory authority to award the CPCN granted in this case, that substantial evidence supported its decision, and that its decision was just and reasonable. Second, Boulder argues that PURPA forbade the PUC from issuing the CPCN, because doing so would lower payments to Boulder in contravention of the statute's requirements. We hold that PURPA and its implementing regulations allow for the contractual arrangements that result in the reduced payments Boulder seeks to avoid. Finally, Boulder argues that the PUC's utility planning regulations forbade issuance of the CPCN. We hold that the version of the regulations applicable to this case allows for issuance of a CPCN under the circumstances here and that the PUC complied with its regulations. We now proceed with our analysis.

### B. Boulder's Relationship with PSCO

Understanding Boulder's position in this appeal requires a brief background discussion of the electric utility industry. For our purposes, this discussion begins with the energy crisis of the 1970's, which prompted intense interest in policies that would ensure the United States' energy independence. At that time, electric utilities consumed approximately 25% of the nation's energy resources for power generation and were heavily reliant on oil and gas. *See FERC v. Mississippi,* 456 U.S. 742, 745–46, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Passed in 1978 as Part V of the National Energy Act, PURPA was designed to help limit our country's dependence on foreign oil and to encourage renewable and other environmentally-friendly technologies in the production of electricity. *See id.; see also* Hon. Richard D. Cudahy, *PURPA: The Intersection of Competition and Regulatory Policy,* 16 Energy L.J. 419, 421 (1995).

Section 210 of PURPA directed the Federal Energy Regulatory Commission (FERC) to adopt "such rules as it determines necessary to encourage cogeneration and small power production ... which rules require electric utilities to ... purchase electric energy from such facilities." *See* 16 U.S.C. § 824a–3(a) (1994). In 1980, FERC promulgated regulations at 18 C.F.R. Part 292 that directed utilities to purchase power from "qualifying facilities" [2] at the utility's avoided cost.[3] *See* 18 C.F.R. § 292.303(a). Responsibility for implementing PURPA was left to the states. *See* 16 U.S.C. § 824a–3(f)(1). We have discussed the role of the PUC with regard to PURPA and qualifying facility contracts extensively in *Phoenix Power Partners v. Public Utils. Comm'n,* 952 P.2d 359, 364–67 (Colo.1998).

Boulder owns several QF's that sell power to PSCO; CIEA represents numerous other QF's that do the same. The calculation of avoided costs that forms the basis for pay-

---

**2.** Qualifying facilities can be cogeneration or small power production facilities. *See* 18 C.F.R. § 292.101(b)(1) (1999). Cogeneration facilities produce electric energy or useful thermal energy through sequential use of energy (e.g., by harnessing otherwise wasted heat to generate energy). Small power production facilities must have a generating capacity of under 80 megawatts to qualify under the Act, though certain solar, wind, and waste generating stations are exempted from this cap. *See* 18 C.F.R. § 292.204(a)(1). They must also have a primary fuel source which is 75% biomass (i.e., non-fossil fuel organic matter), waste, renewable resources (e.g., solar power, wind power, or hydropower), or geothermal resources, or a combination thereof. *See* 18 C.F.R. § 292.204(b)(1)(i).

**3.** "Avoided costs means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6).

ments to Boulder and other QF's in Colorado is made with reference to costs of power generation at Pawnee. Because the upgrade project at Pawnee rendered the plant more efficient and increased its capacity, the cost of producing power at Pawnee went down. This, in turn, reduced the payments PSCO must make under its contracts with Boulder and other QF's. This reduction in payments motivated Boulder's challenge here.

Essentially, Boulder argues that PSCO initiated the upgrade project at Pawnee primarily to reduce its payments to QF's. Boulder points out that Pawnee was the newest and most efficient of all the plants PSCO operates even before the upgrade project took place. Moreover, notes Boulder, PSCO conceded in these proceedings that it did not require the additional capacity that the upgrade project would provide in order to serve its customers. Because the existing turbines at Pawnee could easily have lasted until the next-scheduled maintenance at Pawnee in 2004, argues Boulder, the evidence suggests that PSCO undertook the upgrade project expressly to reduce QF payments.

We turn now to Boulder's specific arguments.

### C. CPCN for a Project Already Undertaken

Boulder first argues that the PUC exceeded its authority by issuing the CPCN to PSCO in contravention of the plain language of section 40–5–101, 11 C.R.S. (1999), and caselaw construing it. That section reads, in relevant part:

§ 40–5–101. New construction——extension

(1) No public utility shall begin the construction of a new facility, plant, or system or of any extension of its facility, plant, or system without first having obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction.

The PUC answers that this section binds public utilities only, and does not constrain the PUC itself in considering whether to issue a CPCN. Boulder replies that the PUC

is bound to enforce and obey the provisions of the Public Utilities code, including section 40–5–101.

■ ■ We hold that section 40–5–101 does not prevent the PUC from issuing a CPCN in this case. The agency has discretion to award a CPCN retroactively if it determines, based on evidence in the record, that its issuance will serve the public interest.

#### 1. Prior Precedent

Boulder points to a number of cases in which we overturned PUC decisions awarding CPCNs retroactively. *See Western Colo. Power Co. v. Public Utils. Comm'n,* 159 Colo. 262, 272, 411 P.2d 785, 791 (1966); *Public Utils. Comm'n v. Harvey,* 150 Colo. 158, 170, 371 P.2d 452, 458–59 (1962); *Donahue v. Public Utils. Comm'n,* 145 Colo. 499, 359 P.2d 1024 (1961). These cases are distinguishable.

In *Western Colorado Power,* we reversed a PUC decision awarding a CPCN to the Colorado Ute Electric Association for construction of the Hayden power plant. In doing so, we described now-section 40–5–101 as "mak[ing] mandatory proof of public convenience and necessity *prior to* the construction of any new plant or system." *See* 159 Colo. at 273, 411 P.2d at 791 (emphasis added). However, the basis for our reversal in *Western Colorado Power* was duplication of electric service, not the retroactive grant of a CPCN. Indeed, the power plant in that case had not yet been constructed at the time the CPCN was issued. We determined that the grant of a CPCN in that case ran contrary to the public interest, as it would result in duplicative electric services inconsistent with Colorado's rule of regulated monopoly. *See id.* Thus, the language describing the statute as requiring "prior" approval from the PUC was merely descriptive, and not controlling.

*Harvey* involved a hauling service that had expanded its operations considerably beyond those granted in its CPCN even after a decision by the PUC forbidding such an expansion and a judgment of this court upholding the PUC. The illegal hauling at issue in *Harvey* persisted for eight years, and it resulted in duplicative services that both the

PUC and this court found to be contrary to the public interest and Colorado's concept of regulated monopoly. Because of "eight years of continuous, unlawful, defiant, contemptuous, expanded operations ... with a total lack of proof of need for additional service," we reversed the PUC's grant of a CPCN in that case. *Harvey*, 150 Colo. at 166, 371 P.2d at 456.

*Donahue*, another common carrier case, like *Harvey*, also involved duplicative provision of services and a lack of competent evidence in the record to support the PUC's findings vis-à-vis the public interest. The case before us demonstrates no sign of contumacy and competent evidence supports the PUC's findings that the upgrade project will serve the public interest.

### 2. Contemporary Precedent

In tension with Boulder's position are contemporary authorities recognizing the PUC's discretion in enforcement matters. Our first task is to discern whether section 40–5–101 and other provisions of the utilities code speak directly to the question of whether the PUC may award a CPCN for a project already undertaken by a utility. If "the legislature has addressed the precise question at issue," we construe the statute accordingly and afford no deference to the agency's interpretation. *North Colo. Med. Ctr., Inc. v. Committee on Anticompetitive Conduct*, 914 P.2d 902, 907 (Colo.1996). If, however, the statutory authorities are silent or ambiguous, we afford deference to the PUC's interpretation. *See id.* We conclude that the utilities code does not specifically speak to the PUC's authority to issue a CPCN validating actions already undertaken by a utility. We determine that section 40–5–101 and the utilities code leave the agency with considerable enforcement discretion.

Boulder is correct in asserting that under section 40–7–101 the PUC has a duty to see that section 40–5–101 is "enforced and obeyed." Section 40–7–101 provides, in relevant part:

It is the duty of the commission to see that the provisions of the constitution and statutes of this state affecting public utilities ... are enforced and obeyed....

Our recent cases, however, recognize that the PUC has considerable enforcement discretion when it acts in the public interest. *Boulder Airporter* presented circumstances similar to those here. In that case, we upheld the PUC's decision to grant a CPCN to a shuttle operator even though the applicant had violated conditions of its temporary authority. *Boulder Airporter* distinguished *Harvey* and *Donahue* on grounds that the public interest supported awarding a CPCN to the applicant, and we applied a deferential standard of review. *See Boulder Airporter*, 918 P.2d at 1121. We concluded that substantial evidence supported the PUC's decision to award a CPCN despite the applicant having already undertaken activities for which it sought the CPCN.[4] *See id.* at 1122.

Here, as in *Boulder Airporter*, the PUC's finding and decision in the public interest to award a CPCN to PSCO for activities already undertaken is within its authority under section 40–7–101; is supported by substantial evidence; and is just and reasonable. We discuss each of these criteria in turn.

### a. PUC Authority Under Section 40–5–101

"The PUC has a general responsibility to protect the public interest regarding utility rates and practices. In fulfilling that function ... the PUC has broadly based authority to do whatever it deems necessary to accomplish the legislative functions delegated to it." *City of Montrose v. Public Utils. Comm'n*, 629 P.2d 619, 624 (Colo.1981); *see also* § 40–3–102. "[I]n view of the commission's special expertise in public utility regulation, we give great deference to the PUC in its selection of an appropriate remedy" in enforcing the utilities code. *Mountain States Tel. & Tel. Co. v. Public Utils.*

---

**4.** *PSCO v. Shaklee*, 784 P.2d 314 (Colo.1989), though not addressing the PUC's authority directly, is factually analogous as well. We held there that PSCO was not required to secure a CPCN before condemning land for extension of a transmission line. As here, the facility extension was complete prior to decision on the CPCN. Although the issue before us in that case was the propriety of a condemnation rather than issuance of a CPCN per se, it suggested the result we reach today.

*Comm'n,* 763 P.2d 1020, 1030 (Colo.1988). We hold that sections 40–3–102 and 40–7–101 afford the PUC sufficient flexibility in its enforcement of section 40–5–101 to permit the PUC's award of the CPCN here.

Certainly section 40–5–101 requires a utility to file for a CPCN prior to initiating a facility extension if the utility wants assurance that its investment will be recoverable through rates and charges to consumers. If, as here, a utility does not obtain prior approval, it has no vested right to recover for the cost of expanded facilities or service areas and therefore proceeds at its own risk. *Cf. Mountain States Tel. & Tel.,* 763 P.2d at 1030 (noting utility assumption of risk in asset transfer context).

As with all sections of the utility code, the PUC is not free to ignore section 40–5–101; consistent with section 40–7–101, the agency has a duty to enforce section 40–5–101 in the appropriate circumstances and see that it is obeyed. *See* § 40–7–101; *see also Office of Consumer Counsel v. Mountain States Tel. & Tel.,* 816 P.2d 278, 283 (Colo.1991) ("The Commission's powers are not unlimited, however. Specific statutory provisions regulating public utilities serve to restrict the Commission's authority.") The PUC must examine a utility's expansion—regardless of when it is effected—for compliance with section 40–5–101 and applicable regulations, and the PUC's decision under the statute must be consistent with the principles of regulated monopoly that section 40–5–101 advances. In reaching its decision, however, the PUC has considerable discretion to fashion a remedy that benefits the public interest. Granting a CPCN for actions already undertaken by a utility is within the purview of that discretion when supported by the evidence and when just and reasonable. *See Boulder Airporter,* 918 P.2d at 1122.

### b. Substantial Evidence

When determining whether substantial evidence exists to support a PUC decision, we view evidence in the record in the light most favorable to the agency's decision. *See CF & I Steel,* 949 P.2d at 585. Further, we presume the PUC's findings and conclusions to be valid. *See id.* If this deferential review of the record reveals that substantial evidence does support the agency's decision, "the judicial inquiry is at an end, for the reviewing court is not permitted to substitute its judgment" for that of the PUC. *Id.*

The evidence underlying the agency's decision must be adequate to support a reasonable conclusion. Substantial evidence is

> more than a scintilla ... it must do more than create a suspicion of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ... it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*Id.*

> Here, the PUC concluded:

> [T]he benefits of an improved heat rate, the added capacity associated with the turbine upgrade, and the expected reductions in costs are sufficiently substantial to justify the grant of a CPCN. Improvements in heat rate and generation efficiencies generally are in the public interest, and the Company is encouraged to pursue such cost effective improvements where feasible, system wide.[5]

Substantial evidence in the record supports this conclusion. PSCO submitted affidavits explaining the benefits expected to result from the project. The record contains testimony regarding a utility modeling program that supported this assertion of benefits. The PUC found this testimony credible. Moreover, PUC staff testified in support of the upgrade project as being a measure that would increase efficiency and benefit ratepayers. Indeed, PUC staff stated in its brief before the PUC in this proceeding that "[f]or some time, staff has worked to find ways,

---

5. The PUC's conclusion mirrors that of the ALJ, who found that the upgrade project "should result in lower operating and maintenance costs and provide immediate benefit to ratepayers."

and to encourage [PSCO], to increase Pawnee's operating efficiency."

While Boulder questions why PSCO undertook the upgrade at Pawnee, rather than at older stations, the record demonstrates not only that Pawnee is PSCO's largest generating station, but that the upgrade was undertaken in order to take advantage of an upcoming scheduled maintenance outage in 1997. This evidence is sufficient to uphold the PUC's decision granting a CPCN for the upgrade project.

### c. Just and Reasonable

■ Our examination of whether the PUC's decision was just and reasonable under the circumstances likewise recognizes the considerable discretion Colorado law has vested in this agency. The PUC's expertise and extensive staff support render it much better able to assess impacts to the public interest from a utility action than the courts. Accordingly, we defer to the PUC's finding that a utility action benefits the public.[6]

■ Here, the PUC concluded that the upgrade project would benefit the ratepaying public. Furthermore, the PUC conditioned its approval on the upgrade project's meeting the projections of ratepayer benefit proffered by PSCO.[7] By doing so, the PUC effectively acted to prevent the project from harming the public interest. Accordingly, we conclude that the PUC's decision was just and reasonable.

### D. Compliance with PURPA

■ Boulder's next argument is that the PUC's approval of the upgrade project violates PURPA. It grounds this argument on an analysis of how the upgrade project will change payments to QF's. In essence, Boulder contends that because the upgrade project will reduce energy payments to QF's, but not account for costs that would otherwise increase capacity payments, the PUC's decision to award a CPCN here results in payment of less than full avoided costs to QF's. This, Boulder alleges, violates PURPA.[8]

■ Under PURPA, QF's receive payments for their power based on two factors: capacity costs and energy costs. Capacity refers to the amount of energy a facility is capable of producing at any given time. Energy is the amount of electricity actually produced by the facility over time. *See Phoenix Power Partners v. Public Utils. Comm'n*, 952 P.2d 359, 361 n. 2 (Colo.1998).

Like all QF's that have contracts with PSCO, Boulder's contracts feature a fixed capacity payment and a fluctuating energy payment. The PUC's regulations implementing PURPA specifically provide for this sort of contract. *See* Rule 3.508, 4 C.C.R. 723–19. Because the upgrade project will reduce energy payments to QF's, while capacity payments remain fixed pursuant to contract, payments to QF's will drop. Thus, Boulder maintains, PSCO will not truly be paying its full avoided costs to QF's.

Both FERC's regulations and the PUC's regulations, however, specify that QF's may elect, as Boulder did here, to fix their payment levels pursuant to contract. *See* 18 C.F.R. § 292.304(d); Rule 3.5072, 4 C.C.R. 723–19. In the past, this contractual framework has worked to the benefit of many QF's, as utilities delivered payments pursuant to contract that actually exceeded their avoided costs. *See, e.g., Independent Energy Producers Ass'n v. California Pub. Utils.*

---

6. We recognize that in assessing the public interest, courts and the PUC should not equate the public interest with ratepayer benefits alone. PURPA, for instance, clearly illustrates Congress's judgment that diversifying the nation's energy resources and encouraging clean sources of energy serves the public interest. *See Cudahy, supra,* at 420. The determination of whether the public is benefited, however, is a responsibility committed to the discretion of the PUC based on the facts and law before it.

7. Like the ALJ, the PUC adopted a plan that capped recovery for the turbine upgrade project at the costs represented by PSCO; held the company liable for availability losses attributable to the upgrade project; and held the company liable for failure to achieve the performance gains represented by PSCO.

8. Boulder also alleges that PSCO implemented the upgrade project for the primary purpose of lowering QF payments. The PUC rejected this contention, and we do not here disturb its determination, based on the record.

*Comm'n,* 36 F.3d 848, 858 (9th Cir.1994). FERC determined that certainty as to rates was sufficiently important to justify fixing payments in contracts despite the risk of deviation from actual avoided cost. *See id.* (citing 45 Fed.Reg. 12214, 12224 (1980)).

■ We will not disturb the rule that the PUC established to guide the contracting process between utilities and QF's simply because financial returns to QF's may change over time under the adopted framework. "The time for challenging that decision has passed, and the validity of the conclusions underlying that decision are not before the court." *Phoenix Power Partners,* 952 P.2d at 366. We ascertain nothing in PURPA, the FERC regulations, or the PUC's regulations that prevents the upgrade project here. Boulder may not unilaterally rescind or modify its contract, *see Independent Energy Producers,* 36 F.3d at 858, nor may it collaterally attack prior commission rulings establishing the contracting process. *See* § 40–6–112, 11 C.R.S. (1999). Accordingly, we uphold the decision of the PUC denying relief under PURPA.

### E. Application of the PUC's Integrated Resource Planning Regulations

Boulder's final argument focuses on regulations that the PUC established to guide expansion of utility services. In essence, Boulder contends that the PUC violated its own regulations when it issued a CPCN for the upgrade project.

Boulder's argument in this regard is two-fold. First, it argues that because PSCO failed to satisfy a technical filing requirement, revised regulations mandating competitive bidding for utility expansion projects should have governed the upgrade project. Second, failing acceptance of the first argument, Boulder contends that regulations in place at the time PSCO initiated the upgrade project also forbade the PUC from granting a CPCN.

We afford a high level of deference to the PUC in its interpretations of its own regula-

tions. *See Trigen,* 982 P.2d at 322; *CF & I Steel,* 949 P.2d at 585. We overturn a PUC construction of its regulations only when clearly erroneous. *See Phoenix Power Partners,* 952 P.2d at 367. Here, we ascertain no error.

■ Boulder first relies on what it admits is a "hypertechnical" argument that PSCO originally submitted only a faxed signature page of its application to the PUC and did not submit an original signature until a date when the PUC's new Integrated Resource Planning (IRP) rules would have governed its application for the upgrade project. The PUC did not credit this argument, and we will not intrude on appeal into the PUC's decision to waive a minor, technical violation of its own filing rules.

■ Second, Boulder claims that the PUC failed in its approval of the upgrade project to comply with its original IRP rules, which do not require competitive bidding. Those rules, formerly codified at 4 C.C.R. 723–21 and effective January 30, 1993 through July 29, 1996, were intended:

> [T]o minimize electric rates and utility revenue requirements to benefit the people and state of Colorado in meeting electric-energy service needs, while recognizing the need to preserve reliable electric service, maintain reasonable electricity prices, and manage risks. This process is also intended to encourage public involvement in the development and

*See* Rule 1.01, 4 C.C.R. § 723–21 (1996). The original IRP rules required utilities to draw up plans to guide their future acquisition and use of power. *See CF & I Steel,* 949 P.2d at 580. They provided for public participation in the formation of those plans.

They also provided, however, for the PUC to approve of variances from the plans drawn up under the IRP process. Rule 8.03(f) noted that the PUC's approval of a utility's plan did not preclude a subsequent PUC approval of actions inconsistent with the plan in, *inter alia,* proceedings awarding a CPCN under § 40–5–101.[9] The PUC relied on this rule in

---

9. Rule 8.03(f) provided:
   The approval of a utility's IRP by the Commission ... shall not preclude an independent

finding by the Commission which differs from the utility's approved IRP in a subsequent proceeding in which the utility seeks the recovery

denying Boulder's petition for reconsideration, and we conclude that it acted properly in doing so. Thus, so long as a utility can show that a variance from its plan is in the public interest, *see* Rule 8.03(e), the PUC is free to grant approvals of the nature granted here. As we hold that the PUC validly concluded that the Pawnee turbine upgrade project served the public interest, its decision granting a CPCN for the upgrade project did not violate the IRP regulations.

### III. Conclusion

Accordingly, we affirm the judgment of the district court.

of revenue for actions taken consistent with its IRP (e.g. rate case review, or application for cost recovery) under C.R.S. 40–3–101 *et seq.,* or the granting of a certificate of public convenience and necessity as required by C.R.S. § 40–5–101 *et. seq.* (Emphasis added.)