**CITY OF FORT MORGAN,**
Petitioner–Appellee

v.

The **COLORADO PUBLIC UTILITIES COMMISSION; Commissioner Gregory E. Sopkin; Commissioner Polly Page; and Commissioner Carl Miller, Respondents–Appellants**

and

**KN Wattenberg Transmission, L.L.C.; Leprino Foods Company; and Cargill Meat Solutions Corporation, Intervenors–Appellants.**

No. 06SA118.

Supreme Court of Colorado,
En Banc.

April 23, 2007.

Ryley Carlock & Applewhite, Dudley P. Spiller, Denver, Colorado, City Attorney, Eric C. Jorgenson, Fort Morgan, Colorado, Attorneys for Petitioner/Appellee.

John W. Suthers, Attorney General, David A. Beckett, Assistant Attorney General, Business and Licensing Section, Denver, Colorado, Attorneys for Respondents/Appellants Colorado Public Utilities Commission and Commissioners.

Beatty & Wozniak, P.C., Michael L. Beatty, Michael Noone, Denver, Colorado, Attorneys for Intervenor/Appellant KN Wattenberg Transmission, L.L.C.

Sherman & Howard, L.L.C., Leanne B. De Vos, Denver, Colorado, Attorneys for Intervenors/Appellants Cargill Meat Solutions Corporation and Leprino Foods Company.

Anderson, Dude & Lebel, P.C., Wm. Kelly Dude, Colorado Springs, Colorado, Colorado Municipal League, Geoffrey T. Wilson, Denver, Colorado, Attorneys for Amicus Curiae The Colorado Association of Municipal Utilities and The Colorado Municipal League in Support of the City of Fort Morgan.

Justice HOBBS delivered the Opinion of the Court.

In this appeal from the Morgan County District Court pursuant to section 40–6–115(5), C.R.S. (2006), we review and reverse a judgment of the district court setting aside a decision of the Public Utilities Commission ("PUC" or "Commission").[1]

Because the City of Fort Morgan, a home rule city, owns and operates a natural gas utility within its boundaries, the district court ruled that the PUC lacked jurisdiction to issue a certificate of public convenience and necessity ("CPCN") to another public utility for the operation of a natural gas pipeline serving two industrial customers within the City.

The PUC found that Leprino Foods Company and Excel Corporation both required firm natural gas transportation service, as opposed to interruptible service, because each conducts a perishable food business requiring constant delivery of natural gas. Leprino manufactures dairy products, and Excel is a beef processor.

Fort Morgan refused to provide firm natural gas transportation service to either company. Finding that Fort Morgan was unable or unwilling to provide adequate utility service, the PUC issued a CPCN to KN Wattenberg, L.L.C. ("KN Wattenberg" or "KNW") for the operation of a pipeline to provide firm natural gas transportation service to Leprino and Excel.

Based on its findings of substantially inadequate service and Fort Morgan's inability or unwillingness to provide adequate utility service, which are supported in the record, we hold that the PUC acted properly within its jurisdiction to grant this CPCN. The district court erred in concluding that (1) article XXV and article V, section 35 of the Colorado Constitution prohibited the PUC from issuing this CPCN and (2) section 40–5–102, C.R.S. (2006) prohibited the PUC from issuing this CPCN unless KN Wattenberg first obtained a permit from Fort Morgan.

**I.**

Fort Morgan, a home rule municipality, is the location of two industrial perishable food producers, Leprino Foods Company and Excel Corporation.[2] Leprino manufactures dairy products; Excel is a beef processor. Both of the companies rely exclusively on natural gas as the energy source for conducting their businesses. Both became customers of Fort Morgan's municipal natural gas utility in the early 1990s.

Fort Morgan owns and operates its own utility for selling and/or transporting natural gas to residential and commercial customers. Its natural gas system, serving more than 4,000 customers, consists of ninety-one miles of main lines and sixty-eight miles of service lines. Fort Morgan built a line to serve Leprino and Excel, whose payments for natural gas transportation accounted for approximately 25 percent of Fort Morgan's natural gas revenues by the year 1996, at the time the dispute leading to this case began.

Leprino and Excel initially had purchased their natural gas supply from Fort Morgan. Later, they became transportation customers only. Under this arrangement they pur-

---

1. Intervenors-appellants Leprino and Excel, intervenor-appellant KN Wattenberg, and respondent-appellant PUC presented a series of issues to us for review. We address the two issues that challenge the district court's holding most directly and comprehensively:
    1. Whether when the PUC has determined that firm transportation service is a distinct and necessary service, is essential to two industrial customers, and is not being provided by a home rule municipality, the PUC has constitutional authority to grant a CPCN authorizing that service within the municipality.
    2. Whether the district court misinterpreted the public utilities law in concluding that a permit was a condition precedent for KN Wattenberg to be awarded a CPCN.

2. Excel has changed its name to Cargill Meat Solutions Company. However, the preceding orders and briefs submitted to us all refer to Excel by its former name and thus so do we.

chased natural gas from a supplier other than Fort Morgan and paid the City to transport the gas from the Colorado Interstate Gas Company ("CIG") pipeline to their facilities.

In November 1995, Fort Morgan tripled its rates. Leprino and Excel unsuccessfully sought rate reductions. Unable to secure a firm natural gas transportation service commitment from Fort Morgan, as opposed to interruptible service, they turned to KN Wattenberg for construction and operation of a lateral pipeline from the CIG pipeline outside of Fort Morgan to their premises inside of Fort Morgan. Because it operated an interstate pipeline, KN Wattenberg applied to the Federal Energy Regulatory Commission ("FERC") for authority to construct and operate the lateral pipeline under FERC's interstate jurisdiction. Over Fort Morgan's objection, FERC granted approval.

Fort Morgan appealed FERC's decision to the United States Court of Appeals for the Tenth Circuit. In the meantime, KN Wattenberg completed construction of the lateral pipeline and began providing firm natural gas transportation service to Leprino and Excel.

The Tenth Circuit reversed FERC's assertion of exclusive federal authority over KN Wattenberg's lateral pipeline, holding that the Hinshaw Amendment allowed for PUC jurisdiction. *City of Fort Morgan v. Fed. Energy Regulatory Comm'n*, 181 F.3d 1155, 1159–61 (10th Cir.1999). The Hinshaw Amendment relieves utilities operating an intrastate pipeline from dual state and federal regulation.[3]

In response to the Tenth Circuit's decision, FERC deferred to the PUC's possible assertion of jurisdiction. But FERC also said that it would reassume jurisdiction if the PUC declined it, because KN Wattenberg had reasonably relied on FERC's initial authorization for the construction and operation of the lateral pipeline.

KN Wattenberg applied to the PUC for a CPCN to operate its lateral pipeline and provide firm natural gas transportation service to Leprino and Excel. The PUC assumed jurisdiction and required KN Wattenberg to prove that Fort Morgan's service to Leprino and Excel was substantially inadequate and Fort Morgan was unwilling or unable to provide adequate service to them.

In subsequent proceedings, the PUC determined that Fort Morgan's service was substantially inadequate because Excel and Leprino required firm natural gas transportation service, but Fort Morgan would provide only interruptible service. Firm service is that for which the delivery provider guarantees that nothing short of a force majeure will disturb the service. Fort Morgan reserved the right to interrupt transportation service to Excel and Leprino in favor of its residential customers and did not restrict such interruptions to force majeure circumstances.

The administrative law judge for the PUC made the following findings about the two companies' dependency on firm natural gas transportation service, which the PUC Commissioners adopted in their decision to issue the CPCN to KN Wattenberg:

> Leprino is a large food manufacturer. At its Fort Morgan plant it manufactures dairy and whey products. Leprino uses natural gas at Fort Morgan for process heat and fuel for whey drying. The primary raw material used in this manufacture is raw milk. Leprino has contractual commitments to take milk 365 days per year. There is limited product storage available at Leprino's Fort Morgan facility. Leprino essentially has a take or pay situation in that it must accept the milk. The milk must be processed quickly or else it

---

**3.** The Hinshaw Amendment appears within the federal Natural Gas Act. It excludes from FERC jurisdiction:

> [A]ny person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission.

15 U.S.C. § 717(c) (2006).

can be lost. Leprino has no alternate fuel capability.

Excel is [a] meat processor with a large meat packing plant in Fort Morgan. Excel consumes large quantities of natural gas, with 80 percent for meat processing, 15 percent for water heating, and 5 percent for building heating. Excel has no alternate fuel capability. Excel operates 24 hours a day 365 days a year, receiving up to 150 semi-trailer loads of cattle per day. If the natural gas is not available to Excel, it can divert cattle to other operations, but this is an expensive proposition requiring additional transportation costs. Also, Excel would not be able to move product in process out without natural gas. The meat packing industry operates on a very small margin, typically in the range of 5/10 of 1 percent.

The PUC decided that "the regulated monopoly principle, which generally prohibits the duplication of public utility facilities in a service territory, applies in this proceeding even though the City, as a municipal public utility, is exempt from Commission regulation." The PUC said that Leprino and Excel could not simply abandon Fort Morgan's service because they felt the rates were too high. It also said that the Fort Morgan public utility is exempt from PUC regulation within the City's boundaries. However, it ruled that the PUC is "empowered to grant a CPCN to KNW to serve Leprino and Excel if we determine that the City was unwilling or unable to provide adequate service to the Customers."

Thus, the PUC declined to regulate Fort Morgan's municipal public utility within its boundaries, but determined that it had authority to permit another utility to fill a substantial void in service the City had chosen not to fill. After analyzing the Fort Morgan and KN Wattenberg tariffs, the administrative law judge found that Leprino and Excel required firm natural gas transportation service, which KN Wattenberg agreed to provide, while Fort Morgan had determined to provide only interruptible transportation service and was unable or unwilling to provide firm transportation service.

The PUC adopted these findings in its decision to issue the CPCN to KN Wattenberg:

While Fort Morgan urges that its tariffs provide service that is just as firm as KNW's, the terms of the tariffs indicate otherwise. KNW's tariffs evidence a firm commitment to provide present and future service and discuss interruptions in service which appear to be temporary in nature. The Fort Morgan tariffs, on the other hand, allow it to terminate service whenever adequate capacity does not exist, with no obligation to expand facilities or to continue to serve the shipper. This failure to commit to present and future service is indicative of interruptible rather than firm service. In addition, the City's tariffs allow for termination of transportation service if it would adversely affect the rates, terms, and conditions of service to the transporter's retail customers. Again, this does not show a commitment to continuous firm service but rather service at the convenience of the City. Finally, the discretion given to the City to terminate service if a change in the rates and/or terms and conditions of wholesale service to transporter makes it inappropriate to continue the transportation service is further indicative of the discretionary nature of this service. KNW's tariffs, on the other hand, appear to incorporate more standard *force majeure* type conditions of a temporary nature, with an indication of intent to continue service beyond temporary curtailments.

The PUC based its decision to issue the CPCN on the "facts and circumstances of this case" and emphasized that "any determinations in similar cases in the future must be made based on the individual merits of those cases":

Because the City was not willing to provide firm transportation, KNW's firm transportation service does not duplicate the City's utility service. The City's failure to provide adequate transportation service meets the substantial inadequacy test (for purposes of granting a CPCN to KNW) established in case law associated with [section] 40–5–101, C.R.S., and warrants the award of a CPCN to KNW. We reiterate that our decision here is based on the facts and

circumstances of this case, and any determinations in similar cases in the future must be made based on the individual merits of those cases.

In denying Fort Morgan's petition for rehearing on October 8, 2004, and issuing its final decision, the PUC concluded that issuance of the CPCN, upon a determination that the City is unwilling or unable to provide adequate service, "does not constitute an attempt to regulate the City's utility operations (an action prohibited by article XXV).... We ruled that the Commission could certify KNW to operate in the City *only if the City was unable or unwilling to provide adequate utility service.*" (Emphasis in original).

The district court disagreed with the PUC's conclusions of law, and set aside its decision. It ruled that the PUC's grant of a CPCN was a violation of the Colorado Constitution's article XXV, which exempts municipally owned utilities from PUC regulation, and article V, section 35, which prohibits a delegation of regulatory power over municipalities from the General Assembly to any special commission. The district court also ruled that the PUC could not issue a CPCN unless KN Wattenberg had first obtained a permit from Fort Morgan.

We agree with the PUC, reverse the judgment of the district court, and reinstate the PUC's decision.

## II.

Based on its findings of substantially inadequate service and Fort Morgan's inability or unwillingness to provide adequate utility service, which are supported in the record, we hold that the PUC acted properly within its jurisdiction to grant this CPCN. The district court erred in concluding that (1) article XXV and article V, section 35 of the Colorado Constitution prohibited the PUC from issuing this CPCN and (2) section 40–5–102 prohibited the PUC from issuing this CPCN unless KN Wattenberg had first obtained a permit from Fort Morgan.

## A.

### Standard of Review

Section 40–6–115(3), C.R.S. (2006) governs judicial review of a PUC decision, and it limits review to: (1) whether the PUC has regularly pursued its authority, including whether the decision violates any right of the petitioner under the United States or Colorado Constitutions; and (2) whether the decision is just, reasonable, and in accordance with the evidence. *Durango Transp., Inc. v. Colo. Pub. Utils. Comm'n,* 122 P.3d 244, 247 (Colo.2005).

■ Substantial inadequacy of service is a factual question to be determined by the PUC. *RAM Broad. v. Pub. Utils. Comm'n of Colo.,* 702 P.2d 746, 751 (Colo.1985). A reviewing court may not substitute its own judgment for that of the PUC; the court's role is to determine whether there was substantial evidence in the record to support the PUC's decision. *Id.* at 750–51. The PUC's factual findings on disputed questions such as substantial inadequacy are "final and are not subject to review." *Durango Transp.,* 122 P.3d at 247; § 40–6–115(2), C.R.S. (2006).

■ Courts generally accord deference to the PUC's interpretations of the statutes that govern it. *Trans Shuttle, Inc. v. Pub. Utils. Comm'n of Colo.,* 89 P.3d 398, 403 (Colo.2004); *City of Boulder v. Colo. Pub. Utils. Comm'n,* 996 P.2d 1270, 1274 (Colo. 2000). But we are not bound by the agency's conclusions of law; we must apply the pertinent constitutional and statutory provisions. Deference would be inappropriate if it were to defeat a constitutional provision or the General Assembly's purpose in enacting a statute. *AviComm, Inc. v. Colo. Pub. Utils. Comm'n,* 955 P.2d 1023, 1031 (Colo.1998).

### B.

### The PUC's and Fort Morgan's Authorities

The balance of powers within Colorado's constitution and statutes relating to public utilities respects municipal utility and governance powers while providing the PUC with the ability to ensure adequate utility service to people and businesses throughout the state.

Article XXV of our state's constitution reads:

In addition to the powers now vested in the General Assembly of the State of Colorado, *all power to regulate the facilities, service and rates and charges therefor, including facilities and rates and charges therefor within home rule cities and home rule towns,* of every corporation, individual, or association of individuals, *wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town,* as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate.

Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; *provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities.*

(Emphasis added).

■ This provision grants the PUC authority to regulate non-municipally owned facilities operating within home rule cities, while exempting municipally owned utilities operating within municipal boundaries from PUC regulation. *City & County of Denver v. Pub. Utils. Comm'n,* 181 Colo. 38, 44, 45–46, 507 P.2d 871, 873, 874–75 (1973). A municipally owned utility operating outside of its boundaries is subject to PUC regulation, and a non-municipal utility operating within municipal boundaries is subject to PUC regulation. *City of Durango v. Durango Transp., Inc.,* 807 P.2d 1152, 1157 (Colo.1991); *City of Loveland v. Pub. Utils. Comm'n,* 195 Colo. 298, 301, 580 P.2d 381, 383 (1978).

The power of home rule cities to operate their own utilities is also protected by article V, section 35, which states that "[t]he general assembly shall not delegate to any special commission, private corporation or associa-

tion, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever." This provision prevents the legislature from vesting regulatory authority in any quasi-legislative commission that would enable it to interfere with home rule improvements such as municipal utilities. *City of Thornton v. Pub. Utils. Comm'n,* 157 Colo. 188, 194, 402 P.2d 194, 197 (1965).

In sum, article XXV and article V, section 35 grant the PUC the authority to regulate public utilities throughout Colorado, including those that are located within home rule cities, but not municipally owned utilities operating within municipal boundaries. The rationale for municipal utility exemption from PUC regulation is that the electorate of the municipality exercises ultimate power and control over the municipal utility. *K.C. Elec. Ass'n v. Pub. Utils. Comm'n,* 191 Colo. 96, 100, 550 P.2d 871, 873–74 (1976).

■ Public utilities that are subject to PUC regulation must obtain a CPCN from the PUC by demonstrating that present or future public convenience requires the new construction or extension of the utility facility. Section 40–5–101(1), C.R.S. (2006) provides, in part:

No public utility shall begin the construction of a new facility, plant, or system or of any extension of its facility, plant, or system without first having obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction.

The PUC has authority to grant a retroactive CPCN if it is in the public interest. *City of Boulder,* 996 P.2d at 1276.

■ The PUC requires a showing by the applicant for a CPCN that current service in the area is unavailable or substantially inadequate. *Durango Transp.,* 122 P.3d at 249. The PUC will condition permits so that there is no duplication of service. §§ 40–5–101(1) to –101(2), C.R.S. (2006). The mandate to avoid duplication of service is known as the doctrine of regulated monopoly. *See Durango Transp.,* 122 P.3d at 247–48; *see*

*also Boulder Airporter, Inc. v. Rocky Mountain Shuttlines, Inc.*, 918 P.2d 1118, 1121 (Colo.1996) (holding that "before making a finding of public convenience and necessity, the PUC must determine that the existing service is substantially inadequate"). Section 40–5–101(2) provides:

Whenever the commission, after a hearing upon its own motion or upon complaint, finds that there is or will be a duplication of service by public utilities in any area, the commission shall, in its discretion, issue a certificate of public convenience and necessity assigning specific territories to one or to each of said utilities or by certificate of public convenience and necessity to otherwise define the conditions of rendering service and constructing extensions within said territories and shall, in its discretion, order the elimination of said duplication upon such terms as are just and reasonable, having due regard to due process of law and to all the rights of the respective parties and to public convenience and necessity.

■ Article V, section 35 and article XXV of our state constitution prohibit PUC regulation of municipal utilities within municipal boundaries. *Union Rural Elec. Ass'n v. Town of Frederick*, 670 P.2d 4, 6 (Colo.1983). An obvious form of PUC regulation is the requirement of a CPCN. Thus, the PUC cannot require a municipal utility operating within the municipal boundaries to obtain a CPCN. *City of Greeley v. Poudre Valley Rural Elec. Ass'n*, 744 P.2d 739, 745 (Colo. 1987). Examples of other forms of PUC regulation over municipal utilities prohibited by these constitutional provisions include rate setting and directing a city to purchase its wholesale electric power requirements from one public utility company rather than another. *Town of Holyoke v. Smith*, 75 Colo. 286, 298, 226 P. 158, 162 (1924); *K.C. Elec.*, 191 Colo. at 98, 550 P.2d at 872.

To construct facilities inside of local government boundaries, public utilities must obtain required local government approvals pursuant to section 40–5–101(3), C.R.S. (2006), but issuance of a CPCN is not contingent on first obtaining the local government approval. What the statute provides is that those who have obtained local government approval cannot begin construction of the facility until the PUC issues the CPCN:

*No public utility shall exercise any right or privilege under any franchise, permit, ordinance, vote, or other authority granted after April 12, 1913, or under any franchise, permit, ordinance, vote, or other authority granted before April 12, 1913, but not actually exercised before said date or the exercise of which has been suspended for more than one year without first having obtained from the commission a certificate that public convenience and necessity require the exercise of such right or privilege.*

§ 40–5–102 (emphasis added). The purpose of this provision is to respect both the jurisdiction and powers of local government and of the PUC. *See City of Greeley*, 744 P.2d at 745.

A reciprocal provision is now contained in the PUC statutes. By means of a recent amendment, the General Assembly has provided that no public utility that has obtained a CPCN from the PUC may commence construction of the facility until it has complied with local zoning rules, resolutions, or ordinances:

Except as otherwise provided in section 29–20–108, C.R.S., on or after August 8, 2005, no public utility shall construct or install any new facility, plant, or system within the territorial boundaries of any local government unless the construction, or installation complies with the zoning rules, resolutions, or ordinances of the local government applicable to the property on which the facility, plant, or system is to be constructed or installed. Nothing in this subsection (3) shall be construed to prohibit a local government from granting a variance from its zoning rules, resolutions, or ordinances for such uses of the property. Nothing in this subsection (3) shall be construed to grant the commission any additional authority to restrict a siting application. For purposes of this subsection (3), "local government" shall mean a

county, home rule or statutory city, town, territorial charter city, or city and county.

§ 40–5–101(3).

This provision reinforces the General Assembly's preexisting intent. In sum, neither the past nor present provisions of the PUC statute prohibit the PUC from issuing a CPCN before the local government approval is obtained. However, the 2005 amendment now clearly prevents a utility with a CPCN from installing new facilities on or after August 8, 2005, without complying with local zoning requirements, except as otherwise provided in section 29–20–108, C.R.S. (2006).

In turn, section 29–20–108 provides that the location, construction, and improvement of electrical and natural gas facilities are matters of statewide concern, and this statutory section sets forth criteria applicable to local government regulation of the electrical and natural gas public utility facility siting. Section 29–20–108(1)(a), C.R.S. (2006) contains a legislative finding that "[a] reliable supply of electric power and natural gas statewide is of vital importance to the health, safety, and welfare of the people of Colorado," and section 29–20–108(1)(d), C.R.S. (2006) contains a legislative finding that "[i]t is critical that public utilities and power authorities that supply electric or natural gas service maintain the ability to meet the demands for such service as growth continues to occur statewide."

Section 29–20–108(4)(a), C.R.S. (2006) provides that a public utility may apply to the PUC for a CPCN, but, on or before its application to the PUC, it must notify the affected local government of its proposed construction of a new electrical or natural gas facility or the extension of such an existing facility. The public utility may appeal a denial of the local government permit or application for the new or extended electrical or natural gas facility to the PUC.

These provisions reinforce the constitutional and legislative policy of Colorado's public utilities law, namely, that adequate utility service to all of the people and businesses of Colorado is a primary goal of public utilities law.

## C.
## Application to This Case

This case comes to us under section 40–6–115(3), as it came to the district court, to review a decision of the PUC issuing a CPCN to KN Wattenberg for firm natural gas transportation service to Leprino and Excel through its lateral pipeline. Under this section, our review is limited to whether the PUC has regularly pursued its authority and whether the decision is just, reasonable, and in accordance with the evidence. *Durango Transp.*, 122 P.3d at 247.

The district court concluded that granting the CPCN to KN Wattenberg constituted regulation prohibited by article XXV and article V, section 35 of the Colorado Constitution and section 40–5–102 of the PUC's statute. We disagree.

Colorado's constitutional and statutory provisions strike a balance between local governmental authority over its municipal utility and the authority of the PUC in issuing a CPCN to a non-municipal utility. Colo. Const. art. V, § 35; Colo. Const. art. XXV; §§ 40–5–101, –102. These constitutional and statutory provisions strive to ensure that public utility service is substantially adequate across Colorado, while not disturbing home rule power any more than necessary to accommodate the state interest expressed in the constitution and statutes. *See City & County of Denver v. Qwest Corp.*, 18 P.3d 748, 756 (Colo.2001) (applying the state, mixed state and local, and local interest standard of review and stating, "nothing within [article XXV] itself alters the relationship between the P.U.C.'s power to regulate public utilities and the preexisting powers of a municipality").

Accordingly, section 40–3–101(2), C.R.S. (2006) provides that "[e]very public utility shall furnish, provide, and maintain such service, instrumentalities, equipment, and facilities as shall promote the safety, health, comfort, and convenience of its patrons, employees, and the public, and as shall in all respects be adequate, efficient, just, and reasonable." *See also Durango Transp.*, 122 P.3d at 247–48 (describing the doctrine of regulated monopoly, under which the PUC

may issue a CPCN to an applicant upon finding that the existing utility service is substantially inadequate and the public convenience and necessity justifies applicant's service).

Section 40–3–102 vests in the PUC the power to "generally supervise and regulate every public utility in this state," except that "nothing in this article shall apply to municipal gas or electric utilities for which an exemption is provided in the constitution of the state of Colorado, within the authorized service area of such municipal utility except as specifically provided in section 40–3.5–102."

Section 40–3.5–102, C.R.S. (2006) vests power in the governing body of each municipal utility to adopt all necessary rates, charges, and regulations for service of the municipal utility within the boundaries of the municipality and in service areas that are outside of municipal boundaries. In those municipal service areas outside of municipal boundaries, the PUC has a limited authority to review rates, charges, tariffs, or voluntary plans that vary from those the municipal utility charges to the same class of customers within municipal boundaries. § 40–3.5–102.

The constitutional "exemption" that section 40–3–102 refers to is contained in article XXV and article V, section 35 of our state's constitution. This exemption provides that municipalities may own public utilities that operate within the municipal boundaries free from PUC regulation. In doing so, among the panoply of choices they may make within their authority free of PUC regulation, they may choose what types and levels of service they will provide, what suppliers they will purchase from, what facilities they will construct and install, and the various rates to be charged. *Smith*, 75 Colo. at 298, 226 P. at 162; *K.C. Elec.*, 191 Colo. at 98, 550 P.2d at 872.

The municipal utility exemption from PUC regulation does not exclude the PUC from issuing a CPCN for a public utility it regulates within municipal boundaries. To the contrary, article XXV provides that the PUC has authority to "regulate the . . . facilities and service and rates and charges therefor within home rule cities and home rule towns" of public utilities that are subject to its regulatory authority. Thus, the governing body of the municipal utility cannot exclude the PUC from issuing a CPCN to a regulated public utility for service the municipality chooses not to provide.

In the case before us, the PUC exercised a very limited role predicated entirely on Fort Morgan's choice not to provide firm natural gas transportation service to Leprino and Excel, large consumers of such service whose perishable food operations depend on firm delivery of natural gas. Fort Morgan had the opportunity to provide this service and declined to do so.

Fort Morgan chose instead to provide interruptible service to Leprino and Excel, in favor of its residential customers. At any time during the prolonged controversy surrounding this case, Fort Morgan could have chosen to provide firm natural gas transportation service to Leprino and Excel, and it can still do so. Article XXV and article V, section 35 provide Fort Morgan with this authority. *Union Rural*, 670 P.2d at 8–9 (stating that a municipal utility can compete with a certified public utility for new customers inside of municipal boundaries). If Fort Morgan were to provide firm natural gas transportation service to Leprino and Excel, article XXV and article V, section 35 would, of course, prevent the PUC from regulating that service.

Here, the PUC did not order Fort Morgan to provide the firm natural gas transportation service. That would be unlawful regulation. Nor did the PUC order Fort Morgan to reduce the rates it was charging Leprino and Excel. To the contrary, the PUC ruled that it had no jurisdiction over Fort Morgan's rates, and Leprino and Excel's dissatisfaction with the rates could not be considered by the PUC in the issuance of a CPCN.

Acting to fill a substantial void in service that a municipal utility chooses not to fill or cannot fill is not regulation of the municipal utility by the PUC. Instead, such circumstances involve the PUC permitting a regulated public utility to provide the otherwise substantially inadequate service within the city or home rule city's boundaries. *Boulder Airporter*, 918 P.2d at 1121.

Article XXV and the PUC statutes empower the PUC to act in such a capacity. Under article XXV, the PUC has authority to regulate public utility facilities, other than municipal utilities, inside of home rule cities as with other cities. *City of Greeley*, 744 P.2d at 744. This provision was added to our state's constitution in 1954. *Id.* This provision clearly changed the prior law under which home rule cities, not the PUC, had exclusive jurisdiction over utilities within their boundaries. They could determine, for example, the rates public utilities could charge within municipal boundaries. *City & County of Denver v. Mountain States Tel. & Tel. Co.*, 67 Colo. 225, 234–35, 184 P. 604, 608 (1919). Article XXV "very clearly grants to the General Assembly the power to regulate *public utilities within* home rule cities, a power which, since the adoption of Article XX, had belonged exclusively to home rule cities where the utility was local in use and extent." *City & County of Denver v. Pub. Utils. Comm'n*, 181 Colo. at 45, 507 P.2d at 874 (emphasis in original).

The prohibition on regulation by the PUC of municipal utilities contained in article XXV does not state that the PUC cannot grant a CPCN to another public utility for a utility service inside of municipal boundaries that the municipal utility cannot or chooses not to provide. The article XXV exemption for municipal utilities—"that nothing herein shall be construed to apply to municipally owned utilities"—means that "although the power to regulate *public utilities* within home rule cities is transferred to the General Assembly, there is no intention to give the General Assembly authority to regulate a *municipally* owned utility *within* the corporate limits of the municipality." Colo. Const. art. XXV; *City & County of Denver v. Pub. Utils. Comm'n*, 181 Colo. at 46, 507 P.2d at 875 (emphasis in original); *Union Rural*, 670 P.2d at 7. In sum, what the PUC must avoid is regulating the municipal utility within municipal boundaries.

■ Thus, the PUC may consider and issue a CPCN to a utility other than the municipal utility for service within municipal boundaries only if and when there is a substantial inadequacy in the service the municipal utility provides to its customers and the municipality is unwilling or unable to provide the service. *Boulder Airporter*, 918 P.2d at 1121. When the PUC's decision to grant a CPCN is challenged, the reviewing court must determine whether the PUC's decision was in accordance with the evidence in the record. *Id.*

■ The PUC's expertise includes identifying classes and adequacy of service. *Id.* These are questions of fact for PUC determination. *Durango Transp.*, 122 P.3d at 248. Here, the PUC compared the Fort Morgan and KN Wattenberg tariffs and other indicia of service classifications and levels, and it determined that KN Wattenberg was willing to provide firm natural gas transportation service while Fort Morgan was willing to provide only interruptible service. The PUC found that firm transportation is a "distinct service separate from interruptible transportation or firm sales service." [4]

While Fort Morgan argues that Leprino and Excel's service had never actually been interrupted, its tariff reserved the right in favor of residential customers to interrupt these industrial customers. The PUC found that the businesses in which Leprino and Excel are engaged require firm natural gas transportation service. Because these findings are supported by substantial evidence in the record, we uphold them. *Durango Transp.*, 122 P.3d at 250; *City of Boulder*, 996 P.2d at 1275. The PUC's finding and determination that KN Wattenberg would not be duplicating a service that Fort Morgan's utility was already providing accords with Colorado's regulated monopoly doctrine. *City of Boulder*, 996 P.2d at 1276.

### D.

### The Permit Question

The district court ruled, in the alternative, that the PUC's decision issuing a CPCN to

---

**4.** Fort Morgan argued that its service to Leprino and Excel met the requirements of PUC Rule 17–2.4(b). The PUC's decision explains the rule and adequately explains the meaning of its rule, contrary to Fort Morgan's position. We give deference to the agency's interpretation of its rule. *City of Boulder*, 996 P.2d at 1274.

KN Wattenberg must be set aside because it had not secured a required permit from Fort Morgan before the PUC issued the CPCN.

■ The PUC is not generally empowered to grant a public utility a franchise to use a home rule city's streets, alleys, and public places in the absence of the municipality's consent. *City of Greeley*, 744 P.2d at 745. Nonetheless, a local government cannot deny consent to the PUC regulated utility's use of public rights-of-way via ordinance, if such ordinance is preempted by state law in a matter of statewide or mixed local and state concern. *City & County of Denver v. Qwest*, 18 P.3d at 755–56. However, there is no issue of a local government franchise requirement in this case because Fort Morgan told KN Wattenberg a franchise would not be required.[5]

Even though a franchise is not involved in this case, Fort Morgan asserts, and the district court agreed, that the PUC statutes prohibited it from considering and issuing a CPCN until KN Wattenberg first applied for and obtained the permit. KN Wattenberg responds that, when it built and commenced operation of the lateral pipeline, it was relying on FERC authority and the FERC decision allowing it to do so.

Section 22B–1 of Fort Morgan's City Code requires any entity wishing to construct, operate, or maintain a gas pipeline within city limits to first obtain a franchise or permit. When KN Wattenberg obtained FERC authorization to construct and operate its pipeline, Fort Morgan passed a resolution clarifying that KN Wattenberg was not required to obtain a franchise because its pipeline would not cross any city streets, but, nonetheless, it must apply for and obtain a city permit before constructing and operating the pipeline. This resolution provided that "[b]ecause such facilities shall not be constructed within or use the municipal streets, alleys or other public rights-of-way, it shall not be necessary for KN Wattenberg Transmission, LLC to apply for or obtain a franchise." However, "[t]he terms and provisions of any permit negotiated with KN Wattenberg Transmission, LLC shall be incorporated into an ordinance which shall be presented to the Council for its consideration."

Special Counsel to Fort Morgan forwarded to KN Wattenberg an example permit it had issued for a non-exclusive, revocable permit for a cable community television service. Choosing to rely on FERC's authorization for construction and operation of its pipeline, KN Wattenberg did not apply for or obtain a permit from Fort Morgan.

■ The issue before the PUC, the district court, and us concerning Fort Morgan's permit requirement is whether the PUC is prohibited from issuing a CPCN unless Fort Morgan first grants a permit. The PUC ruled that it had authority to issue the CPCN, but it did not have authority to determine whether KN Wattenberg was in violation of Fort Morgan's approval requirements when it continues to operate its pipeline in reliance on the FERC order: "whether KNW requires permission from the City in order to continue operating the pipeline is beyond our authority to decide."

The district court ruled that the PUC lacked authority under the PUC statutes to issue a CPCN unless KN Wattenberg first obtained a permit from the City of Fort Morgan. We disagree. The applicable PUC statutes in effect at the time of the PUC's decision in 2004, sections 40–5–101, 40–5–102, and 40–5–103, C.R.S. (2006), did not prevent the PUC from issuing a CPCN to a public utility that had not yet obtained the approvals required by a local government. Subsequently, the PUC statute was amended to

---

**5.** A franchise is "a special right or privilege, granted by a government to an individual or corporation." *City of Greeley*, 744 P.2d at 744 (*quoting City of Englewood v. Mountain States Tel. & Tel. Co.*, 163 Colo. 400, 405, 431 P.2d 40, 43 (1967)). Article XX of the Colorado Constitution gives taxpaying electors of home rule cities absolute control over the granting of franchises, and thus the state and its agents, including the PUC, cannot confer a franchise relating to the streets of home rule cities without obtaining municipal consent in the form of a vote from city electors. *City of Greeley*, 744 P.2d at 744. Consequently, both a municipal franchise and a CPCN are required for a public utility to operate within a home rule city such as Fort Morgan. *See id.* at 745. In this case, however, Fort Morgan determined that there was no franchise requirement for the KN Wattenberg lateral pipeline because the pipeline would not cross city streets.

provide that, on or after August 8, 2005, no public utility shall construct or install any new facility, plant, or system within the territorial boundaries of any local government without complying with that government's zoning rules, resolutions, and ordinances. § 40–5–101(3).

We give effect to the plain meaning of these PUC statutes. *Poudre Valley Rural Elec. Ass'n. v. City of Loveland,* 807 P.2d 547, 552 (Colo.1991). Contrary to the district court's ruling, these statutes provide that a public utility may obtain a CPCN before it obtains local government approval.

Nevertheless, article XXV of our constitution preserves to the local government its exercise of "reasonable police and licensing powers." Fort Morgan's franchise or permit requirement, section 22B–1, prevents any person from erecting, constructing, operating, maintaining, or using any natural gas pipeline, plant, or system of gasworks in the City without obtaining a franchise or permit given or granted by ordinance. Section 22B–2 prescribes fines for each day of violation. Section 22B–3 provides for legal actions for violation of the franchise or permit requirement:

> If any person constructs, operates or maintains any natural gas pipeline, plant or system or gasworks, or electric light and power system or works or sells or distributes any natural gas or electricity within the City, or makes any connections with gas or electrical lines or systems contrary to the provisions of the foregoing Section 22B–2, then, in addition to any other remedies and measures provided by law, the City Attorney may commence an action in the name of and on behalf of the City for suitable and appropriate legal and equitable relief.

We agree with the PUC that it did not have authority to determine in this case whether KN Wattenberg is operating its natural gas pipeline in violation of Fort Morgan's reasonable police power requirements, and, if so, to grant relief to the City. If the City were to bring a separate legal action against KN Wattenberg for operating the pipeline without a permit, as provided in its home rule charter, resolutions, and ordi-

nances, the factual and legal issues involving state, mixed state and local, and local concern with regard to the exercise of Fort Morgan's reasonable police power authority would be joined. *See City & County of Denver v. Qwest,* 18 P.3d at 754 (stating that "[a]rticle XXV does not purport to have any effect on the ability of the General Assembly to legislate with regard to matters of mixed statewide and local concern, whether or not they involve public utilities").

## III.

Accordingly, we reverse the judgment of the district court and reinstate the PUC's decision granting the CPCN to KN Wattenberg for a lateral pipeline to provide firm natural gas transportation service to Leprino and Excel. We remand this case to the district court for further proceedings consistent with this opinion.

Justice COATS dissents.

Justice EID does not participate.

Justice COATS, dissenting.

Because I disagree with the majority's narrow construction of Article XXV's restriction on the powers it grants to the Public Utilities Commission, I respectfully dissent. Because, however, the majority finds it unnecessary, under the facts of this case, to address the scope and effect of the power to franchise retained by the city, I understand its opinion to imply nothing about the ability of home rule cities to bar other service providers from operating within the city's own boundaries, by requiring, but denying them, a franchise.

Quite apart from a municipality's power to regulate franchises within its boundaries, I would construe the constitutional proviso's prohibition against PUC interference with municipally owned utilities to leave untouched a home rule city's power to exclude other utility providers in matters of purely local concern. By interpreting the proviso to limit the PUC from no more than requiring a CPCN of municipal utilities or dictating their operational details, the majority reaches the not only counterintuitive, but in my view

anomalous, conclusion that the PUC is constitutionally barred from ordering the city's utility to guaranty Excel and Leprino Foods priority of service over its other citizens, but is perfectly free to threaten, unless the utility accedes, to cripple its economic viability by authorizing, without the city's consent, an alternate service provider for its largest customers.

Furthermore, the majority seems to feel little need to offer any compelling support for this narrow and extremely anti-local construction, taking it as virtually self-evident. In what appears to be largely an exercise in circular reasoning, the majority merely references several examples of prohibited PUC interference, which make no attempt to comprehensively define the scope of the constitutional limitation, and rests on the PUC's statutory mandate to apply the doctrine of regulated monopoly and assess the adequacy of the service provided by utilities. Surely the PUC's statutory authority to regulate matters over which it is constitutionally granted jurisdiction has no bearing on the scope of its constitutionally granted jurisdiction in the first instance.

Similarly, it is far from clear to me whether the majority's holding in this case is in any way dependent upon the nature of the specific utility involved. Although the majority references legislative declarations to the effect that the distribution of natural gas is a matter of statewide concern, the majority does not conclude that extending a pipeline to Excel and Leprino inside the boundaries of the city is a matter of statewide concern or explain the significance of that characterization if accurate. While relevant, a legislative declaration of statewide concern is clearly not dispositive.

On the whole, however, I believe the constitutional proviso must be construed in its entirety, rather than dividing it into its constituent parts, as the majority does, with large gaps in between. I believe the term "franchise," as used in the constitution must be given the broader meaning of any privilege not granted to the public at large, rather than a limited one applying only to enterprises that cross a public street. Perhaps Fort

Morgan has simply hoist itself on its own petard, as the majority seems to hold, by resolving that KN Wattenberg needs only the city's permit, rather than its franchise, but by truncating the constitutional analysis as a result of the city's distinction between a permit and a franchise, the majority leaves unresolved the tension in our prior cases concerning the power of municipalities to protect their status as exclusive service providers within their own boundaries by requiring, but declining to grant, a franchise to prospective competitors.

Although I consider the majority's holding today limited, I nevertheless consider it mistaken. I therefore respectfully dissent.